**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| MILLICENT JO GUIDET, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CIVIL ACTION 11-00144-B |
| | * | |
| MICHAEL J. ASTRUE, | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |

<u>ORDER</u>

Plaintiff Millicent Jo Guidet ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 <u>et seq.</u>  On July 19, 2012, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 13).  Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c). (Doc. 14).  Oral argument was waived. (Docs. 19, 20). Upon careful consideration of the administrative record and the briefs of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

I.   **Procedural History**

Plaintiff protectively filed applications for disability and disability insurance benefits on October 16, 2007. (Tr. 96-100). Plaintiff alleges that she has been disabled since August 31, 2005, due to post surgical back pain, depression, carpal tunnel syndrome, high blood pressure, acid reflux, headaches, and hypothyroidism. (Id. at 64). Plaintiff's earnings record shows that she has sufficient quarters of coverage to remain insured through December 31, 2011 (her "date last insured"), and that she is insured through that date. (Id. at 115). Her application was denied at the initial stage, and on April 5, 2008, Plaintiff filed a timely Request for Hearing before an Administrative Law Judge ("ALJ"). (Id. at 64-7, 72-3). On June 11, 2009, Administrative Law Judge Lawrence Ragona held an administrative hearing, which was attended by Plaintiff, her attorney, and vocational expert, Wendy Klamm. (Id. at 33-62). On July 6, 2009, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 20-32). Plaintiff'=s request for review was denied by the Appeals Council ("AC") on January 28, 2011. (Id. at 1-5, 16-19).

The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  __Issues on Appeal__

A.   Whether the ALJ properly evaluated the medical opinions contained in the record?

B.   Whether the ALJ complied with SSR 96-7p when evaluating Plaintiff's credibility and her subjective complaints of pain?

C.   Whether the ALJ erred by presenting an incomplete hypothetical to the VE?

## III. __Factual Background__

Plaintiff was born on August 17, 1961, and was forty-seven (47) years of age at the time of the administrative hearing, that was conducted on June 11, 2009.  (Tr. 37, 96, 110).  She graduated from high school and earned an associate's degree in medical technology.  (Id. at 39). Plaintiff has past relevant work ("PRW") as a medical technologist.  (Id. at 39, 58).

At the hearing, Plaintiff testified that she had back surgery due to a herniated disc in 2003. (Id. at 40).  Plaintiff further testified that the pain medication she took after her surgery caused her to work slowly, inhibited her from learning new information, and resulted in her falling asleep at work. (Id. at 40-1). Plaintiff testified that she has the most pain in her lower back and left hip and that she uses heating pads, cold packs and lidocaine patches for relief. (Id. at 55).

Plaintiff also testified that she would cry at work due to feelings of hopelessness and incompetence, and that she resigned from her job because she was going to be fired.  Plaintiff

3

indicated that she attempted to start a home computer business, but she was not able to "grasp the concept." (Id. at 41, 45-46). Plaintiff also testified that she "attacked" herself with her fingernails without warning, and as a result, she enrolled in intensive outpatient mental therapy. (Id. at 45-46).

With respect to daily activities, Plaintiff reported that she lives alone, cares for herself, washes dishes, does laundry, makes her bed, and performs other light cleaning tasks to keep her house neat.  Plaintiff also reported that she goes grocery shopping and can carry grocery bags as long as they are not too heavy. Additionally, Plaintiff reported that she is able to drive, that she uses the computer to send emails and pay her bills, that she cares for her pet, and that she visits with family and friends on the telephone[1]. (Id. at 37-38. 43-4, 47, 51, 52, 57).

Plaintiff's medications at various times throughout her treatment have include Wellbutrin, Cymbalta, Deplin, Percocet, Lortab, Fentanyl patches, Provigil, Lidoderm patches, Maxalt,

---

[1] Plaintiff indicated that her estranged husband comes over and cleans her house once a month, unloads groceries for her, and cares for the yard.  (Id. at 37-38, 43-4, 47)

Prilosec, Synthyroid, Requip, Valtrex, Norco, Doragesic patches, Topamax, and Xanax (Id. at 48, 54-5, 288, 363-4).

## IV.  Analysis

### A.  Standard Of Review

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[2]  A court  may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").  In determining whether substantial evidence exists, a court must view the record as a whole, taking

_____

[2]This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

into account evidence favorable, as well as unfavorable, to the Commissioner's decision.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163 (S.D. Ala. 1999).

B.  **Discussion**

An individual who applies for Social Security disability benefits must prove his disability.  20 C.F.R. § 404.1512, 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A), 404.1505(a), 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§ 404.1520, 416.920.[3]

---

[3]The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) (Continued)

In the case sub judice, the ALJ determined that Plaintiff met the non-disability requirements for disability insurance benefits through December 31, 2011. (Tr. 23, 25). The ALJ noted that Plaintiff worked for two months after her alleged onset date but quit that work due to pain caused by her impairments. Thus, he found that the work did not rise to the level of substantial gainful activity and that Plaintiff has not engaged in substantial gainful activity since her alleged onset date. (Id. at 25). The ALJ also concluded that while Plaintiff has the severe impairments of depression, status post lumbar spinal fusion at L5-S1, degenerative joint disease of the cervical spine, and osteoarthritis of the lumbar spine, they do not meet or medically equal the criteria for any of the impairments

---

objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant=s age, education and work history. Id. at 1005. Once a claimant meets this burden, it becomes the Commissioner=s burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4.[4] (Id. at 25-7).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform light work, that Plaintiff can sit for 6 hours in an 8-hour workday and stand and walk for 2 hours in an 8-hour workday and that Plaintiff can sit, stand, and walk for no more than one hour continuously at a time. He also found that Plaintiff is unable to perform complex work due to her mental impairments. (Id. at 27).

The ALJ next determined that while Plaintiff's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of the alleged symptoms were not credible.  (Id. at 28). Relying on the testimony of the VE, the ALJ concluded that Plaintiff's RFC precludes her from performing any of her past work, and that considering her RFC and vocational factors, such as age, education and work experience, Plaintiff is able to perform other jobs existing in significant numbers in the national economy such as gate guard, bioclerk, check cashier, and sorter,

---

[4]  The ALJ determined that Plaintiff's diagnosed carpal tunnel syndrome was a non-severe impairment. (Id. at 25).

all of which allow for a sit/stand option. (Id. at 30-31. The ALJ thus concluded that Plaintiff is not disabled. (Id.)

The relevant evidence of record shows that Plaintiff was treated by David Gower, M.D., at Northwest Neurosurgical Associates from at least April 7, 2003 to November 7, 2006. (Id. at 196-227). An MRI of Plaintiff's cervical spine, taken on June 5, 2003, and compared to a previous study taken May 2002, revealed multilevel degenerative disc disease predominately consistent with uncus and endplate osteophytosis at C4-5 and C5-6, which was more prominent on the left. The radiological report also revealed mild to moderate bony foraminal stenosis bilaterally caused by a bulging disc and endplate and uncus osteophytosis at C6-7. (Id. at 221-2).

Plaintiff was admitted to the hospital for anterior fusion due to progressive and longstanding back pain on July 24, 2003. During surgery, Plaintiff underwent an anterior approach and interbody fusion with cages and bone morphogenic protein. Dr. Gower's treatment notes indicate that post-surgery, Plaintiff responded well and was able to ambulate without significant difficulty with a brace. Her prognosis was noted as "good." Plaintiff was discharged on July 26, 2003, and she was directed to see Dr. Gower in his office in one to two weeks for wound check. (Id. at 216, 219-20).

Dr. Gower's treatment notes dated August 12, 2003 reflect that Plaintiff was "doing quite well." Dr. Gower reviewed x-rays, which showed that Plaintiff's cages were in good position, there was no malalignment of the spine, and her disc space height had been reconstituted. (Id. at 217). While Plaintiff reported significant pain into her back and associated spasm, Dr. Gower opined that Plaintiff had very good results post-surgery. In addition, in response to Plaintiff's request for additional narcotic medication, Dr. Gower opined that Plaintiff's use of narcotics was "really quite brisk," and noted that she would be referred to Dr. Dave for medication management and to aid in weaning her off narcotic medication. Dr. Gower noted that Plaintiff was disabled from her job for three months due to her lumbar spinal surgery and lumbar fusion, and directed her to follow-up in one month. (Id.)

During Plaintiff's September 10, 2003 visit, Dr. Gower once again expressed concern about the amount of narcotic medication that Plaintiff was taking.  He surmised that Plaintiff had a habituation problem with prescription medication, and that she might be a candidate for a detoxification program or would benefit from treatment with a pain management doctor who could gradually reduce her narcotic use. Dr. Gower prescribed Lorcet. (Id. at 215).

10

During her October 15, 2003 visit, Plaintiff reported that her pain was under better control, and that Dr. Doherty had been trying to wean her off of narcotics and pain patches. Plaintiff indicated a desire to return to her work, which mostly involved the computer, and no lifting. Dr. Gower concurred that it was safe for Plaintiff to return to work with no restrictions starting the next day. He advised Plaintiff that her increased activity would likely cause some pain and that she was making good progress. (Id. at 214).

Plaintiff was seen by Dr. Gower three times during 2004. An MRI of Plaintiff's lumbar spine in 2004 showed operative changes of discectomy and placement of caged fusion at L5-S1. No evidence of nerve root compression, focal bulging, or herniation was observed. The cages were noted as appearing within the disc interspace. Severe degenerative desiccation, narrowing, minimal posterior bulging, anterior subligamentous herniation at T11-12, and mild degenerative disc changes at T12-L1 were observed. (Id. at 210). Dr. Gower noted that the MRI demonstrated that Plaintiff does not have adjacent segment disease at L4-5, and that the L5-S1 level looked fused. Upon reviewing a bone scan that Plaintiff underwent in 2004, Dr. Gower opined that Plaintiff's anterior fusion was stable. (Id. at 206-7).

Upon examining Plaintiff in 2006, Dr. Gower noted that Plaintiff's range of motion was good, and she was able to bend

over and almost touch the floor. She was also able to extend back to 20 degree and bend 20 degrees to each side. A straight leg test was negative bilaterally, and Plaintiff's wound appeared "okay." Dr. Gower opined that Plaintiff did not appear to have radiculopathy and that previous MRIs showed some cervical spondylosis that was insignificant and did not require surgery.(Id. at 202-3). Following a CT scan of Plaintiff's lumbar spine on October 5, 2006, Dr. Gower determined that Plaintiff's facet joints and body fusion were properly fused and that there was no indication of adjacent segment disease. He opined that Plaintiff's neck pain was likely related to some spondylosis in the neck and that her arm pain is likely related to carpal tunnel syndrome.[5] Plaintiff was directed to submit for EMG testing of the upper extremities, the results of which demonstrated persistent carpal tunnel syndrome. No evidence of cervical radiculopathy was noted. (Id. at 197-198). The notes from Plaintiff's last visit with Dr. Gower on November 7, 2006 reflect that Plaintiff reported doing better since she had been off work and had reduced her stress. Dr. Gower opined that Plaintiff was a good candidate for further conservative measures. He questioned whether additional surgery made sense

[5] Plaintiff was treated for migraines and night twitching by Dr. Davis at Northwest Neurology from June 29, 2005 to October 16, 2006; however, the notes are not legible. (Id. at 182-195).

for Plaintiff and noted that she was in the process of moving out of town. (Id. at 197).

Plaintiff was also treated for persistent lower back pain, left leg pain, and right knee pain by Dr. Luther Rollins, III, and Dr. Dennis Doherty at Southeastern Pain Specialists from at least August 23, 2005 to at least November 8, 2006. (Id. at 228-82). On exam on August 23, 2005, Plaintiff had a normal Spurling's Test, and her neck had diminished range of motion. Her back was tender over spinous processes with decreased range of motion. Her reflexes were 2/4 bilaterally, and her muscle strength was 5/5 bilaterally in her lower extremities. Plaintiff's gait and station were normal, and no clonus was observed. Plaintiff was assessed with depression, major NOS; cervical spondyloarthritis; inflammation of sacroiliac joint NOS; postlaminectomy syndrome of lumbar region; and cervical arthritis. Plaintiff was directed to continue Norco, Mobic, and Duragesic film. She was scheduled for a left lumbar epidural steroid injection at L3-4. (Id. at 271-2). The record reflects that Plaintiff underwent epidural steroid trigger point injections on at least September 15, 2005, accompanied with an injection of Depo-Medrol to the left knee, February 6, 2006, March 2, 2006, March 17, 2006, April 25, 2006, May 16, 2006, and November 3, 2006. (Id. at 231-3, 249, 254, 257-8, 262-3, 270, 280-2).

The treatment notes from Southeastern Pain Specialists reflect a couple of instances during which Plaintiff was counseled about overusing her Duragesic pain patches and warned that such unauthorized use of her medication would result in her being discontinued as a patient. See (Id. at 242-8, 257-9, 266-7). The treatment notes dated July 10, 2006 reflect that Plaintiff reported being terminated from her job due to being drowsy and that she was seeking social security disability benefits. Dr. Rollins opined, based on "objective findings," that Plaintiff was not "permanently disabled and [that she] could work in some capacity." In response to Plaintiff's reports of decreased concentration, Dr. Rollins suggested that she taper off medications. (Id. at 242-3).

The records reflect that Plaintiff was provided mental health treatment by psychiatrist Mark Hutto from June 17, 2005 through December 4, 2006. (Id. at 283-339). During this period, Plaintiff reported depression, anxiety, difficulty concentrating, problems at work and losing temper. (Id. at 317-320, 336). Dr. Hutto recommended Plaintiff for partial hospitalization in 2005, and she was admitted to Ridgeview Institute on June 17, 2005. (Id. at 317-320). On admission, Plaintiff reported severe depression and anxiety for many years, and some suicidal ideas. She also reported that she was currently stressed by her inability to work adequately and the

14

financial problems that it may cause. Plaintiff's diagnosis included major depression, severe and recurrent, generalized anxiety disorder, and chronic pain syndrome. (Id.) Her GAF score was 25[6]. A treatment plan, which included a review of her medication, and individual psychotherapy, group therapy, and educational classes for depression, was developed for Plaintiff. (Id. at 320). Dr. Hutto released Plaintiff to return to work in August 2005. (Id. at 330). Dr. Hutto's notes reflect that during 2006, Plaintiff's symptoms waxed and waned. (Id. at 291)

---

[6] The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A GAF score of 11-20 indicates some danger of hurting oneself or others; a score of 21-30 suggests behavior that is considerably influenced by delusions or hallucinations or serious impairment, in communication or judgment; a score between 31 and 40 reflects some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood; a GAF score of 41-50 indicates serious symptoms indicative of antisocial behavior (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious social dysfunction (e.g., no friends, unable to keep a job), a score between 51-60 suggests moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers); and a GAF score of 61-70 is indicative of mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. See http://www.gafscore.com/. (Last visited May 21, 2012).

Plaintiff received mental health treatment at Southwest Amb. Behavioral Services from January 11, 2007 through February 1, 2007. (Id. at 340-70). Plaintiff reported she was struggling to function due to depression and that she had daily thoughts of death. Plaintiff also rated her pain as a "three" on a scale of "one" to "ten." Plaintiff's memory and concentration were intact, her affect was constricted, her mood was sad, anxious and severely depressed. (Id. at 351-2). Plaintiff's GAF was 35, and she was diagnosed with major depression without psychosis and chronic pain syndrome. Her prognosis was guarded, and she was admitted for the full day program. (Id. at 354). Her treatment plan included education on disease process with group therapy and weekly medication management with Dr. Edgardo Concepcion. Upon discharge on February 1, 2007, Plaintiff was "moderately improved" and her GAF was 50. Her follow-up care plan included individual therapy and medication management with Dr. Concepcion. (Id. at 341-3).

The record reflects that thereafter, Plaintiff was seen by Dr. Concepcion at the Abbeville Community Health Center twice in 2008 and once in May 2009. (Id. at 371-3, 445-9, 481-7, 515-23). In treatment records from 2008, Dr. Concepcion noted that Plaintiff's mood was depressed and anxious, her affect was constricted, her concentration and attention were impaired, and she had "flight of ideas"; however, her judgment and memory were

16

intact. (Id. at 447-9).  He diagnosed Plaintiff with bipolar
disorder, anxiety, and chronic pain and assigned her a GAF of 40
for that period, and for the past year. (Id.)

On May 22, 2009, Dr. Concepcion completed a
Psychiatric/Psychological Impairment Questionnaire. (Id. at 515-
23). In it, Dr. Concepcion diagnosed Plaintiff with major
depression, recurrent and severe, without psychosis, anxiety
disorder, chronic pain, and restless leg syndrome. He assigned
Plaintiff a current GAF of 35, and opined that 55 was her
highest GAF for the past year (Id. at 516). Dr. Concepcion
opined that Plaintiff's depression and anxiety were the most
frequent and/or severe of her symptoms. He noted that Plaintiff
had not required hospitalization for her symptoms and that her
symptoms and functional limitations were reasonably consistent
with her physical and emotional impairments described in the
Questionnaire.

Dr. Concepcion opined that Plaintiff is "moderately
limited" in her ability to carry out simple one or two-step
instructions, carry out detailed instructions, ask simple
questions and request assistance, interact appropriate with the
general public, maintain socially appropriate behavior and
adhere to basic standards of neatness and cleanliness, and set
realistic goals or make plans independently. He also opined that
Plaintiff is "markedly limited" in her ability to remember

locations and work-like procedures, understand and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and travel to unfamiliar places or use public transportation. (Id. at 518-21).

With respect to whether Plaintiff would experience episodes of deterioration or decompensation in work or work like settings, Dr. Concepcion's notes appear to reflect that it is unknown whether Plaintiff would experience such because Plaintiff had not been employed since moving to Louisiana[7]. (Id. at 521).  In another place on the questionnaire, Dr. Concepcion indicates that Plaintiff is capable of low stress work, and again makes reference to the fact that Plaintiff has not been employed in Louisiana. (Id. at 522).

The record also contains the treatment records of Dr. Matthew Mitchell at the Louisiana Pain Management Center. (Id. at 374-400, 470-80, 488-506).  Plaintiff was referred to Dr.

---

[7]Some of Dr. Concepcion's handwritten notes are difficult to decipher.

Mitchell for pain management after she moved from Atlanta to Louisiana. Dr. Mitchell treated Plaintiff from February 28, 2007 to April 3, 2008.[8] (Id.) The records reflect that during his initial exam of Plaintiff, Dr. Mitchell noted that Plaintiff had significant tenderness in the paraspinous muscles in her cervical spine and over the lumbar spine, that pressure over the lumbosacral area increased the pain, and that spasm in that area was observed. (Id. at 385-7). Plaintiff's straight leg raise test was negative, the strength in her lower and upper extremities was normal and sensation was intact. (Id. at 386). Dr. Mitchell's diagnostic impression was lumbar post laminectomy syndrome, lumbosacral radiculitis, cervical spondylarthritis, cervical radiculitis, osteoarthritis multiple sites, sacroilitis, depression and anxiety secondary to pain. Plaintiff's Norco, Duragesic, Lidoderm, and Valtrex were refilled, and a back brace was prescribed. Plaintiff was directed to follow up in 3 months for a medication review. (Id. at 385-400).

Dr. Mitchell's treatment notes dated August 8, 2007 reflect that Plaintiff's medications were working well and that she was

---

[8] The record indicates that Plaintiff received treatment from Dr. Edward Kemp Coreil fives times between October 30, 2007 through January 18, 2009. (Id. at 418-24, 450-55, 507-14).

getting good relief. An MRI of Plaintiff lumbar spine taken October 29, 2007 demonstrates post-operative changes at L5-S1 but no evidence of recurrent disk herniation or spinal stenosis. (Id. at 506). Dr. Mitchell's treatment notes dated December 18, 2007 reflect that the MRI shows postoperative changes at L5-S1, but no evidence of recurrent disc herniation or spinal stenosis. He opined that Plaintiff was continuing to have pain in her back due to post laminectomy syndrome and radiculitis. (Id. at 504).

Dr. Mitchell completed a Lumbar Spine Questionnaire on April 2, 2008, wherein he listed Plaintiff's diagnosis as lumbar post-laminectomy syndrome, osteoarthritis, and cervical radiculitis, and noted her prognosis as "poor." (Id. at 471-477). In the section entitled "positive clinical findings," Dr. Mitchell notes that that Plaintiff had a limited range of motion of 40 degrees in her back and neck, tenderness in her neck and back, muscle spasm in her neck and back, sensory loss in her hands, and trigger points in Plaintiff's lower back and neck. Plaintiff's gait was normal and her straight leg raising was negative. (Id. at 472). In addition, no swelling or crepitus was noted. (Id.)

Dr. Mitchell opined that Plaintiff could occasionally lift or carry up to 5 pounds and never lift or carry more than that amount. He also opined that Plaintiff could sit no more than an hour in an eight-hour workday and could  stand/walk no more than

an hour in an eight-hour workday. (Id. at 471-476). He further opined that Plaintiff's pain was severe enough to interfere with her attention and concentration, that Plaintiff would need to take 15 to 30 minute breaks every hour, that Plaintiff would miss work more than 3 times per month, and that she is incapable of tolerating even "low stress work." (Id.) He also opined that Plaintiff cannot push, pull, kneel, bend or stoop, and that she should avoid heights, humility, noise, fumes, gases and temperature extremes. (Id.) He further opined that Plaintiff's impairments are ongoing and are expected to last at least 12 months.

Plaintiff was evaluated on November 24, 2007 by Eric R. Cerwonka, Doctor of Psychology, at the request of the Agency. Plaintiff reported a history of depression, residual back pain following lumbar fusion, and poor concentration. On exam, Dr. Cerwonka observed that Plaintiff's mood ranged between euthymic and mildly depressed, and her affect was restricted. Plaintiff was alert and oriented times four, she could recite the month, day, and year, and she could repeat 3 out of 3 objects immediately, recall 2 out of 3 after one minute, and 3 out of 3 after 5 minutes. Plaintiff's pace and persistence were noted as fair, and Dr. Cerwonka noted she could perform repetition skills and 3-stage command. Plaintiff was able to repeat 5 digits

forward and 4 backward. Her intellectual functioning seemed to be within the average range.

Dr. Cerwonka diagnosed major depressive disorder, recurrent, moderate; rule out opiate dependence; and hypothyroidism. Plaintiff's GAF was 65, and Dr. Cerwonka opined that Plaintiff's disorders, in and of themselves would not be expected to prevent her from working. He also opined that Plaintiff has no intellectual limitations or cognitive defects that would be expected to prevent her from working. He remarked that Plaintiff was able to understand, retain, and follow instructions and sustain enough concentration and attention to perform both simple and more complex tasks during the examination. He also observed that Plaintiff seemed to be able to relate well to others on a one-on-one basis and concluded that there did not seem to be any psychiatric, cognitive, or behavioral problems that would prevent her from regular, full-time work. (Id. at 425-300).

Agency medical consultant Joseph Kahler, PhD, completed a Psychiatric Review Technique assessment on December 17, 2007. He opined that Plaintiff has the non-severe impairments of affective disorder, specifically major depressive disorder, recurrent, moderate, and opioid dependence. He determined that Plaintiff experienced mild limitations in activities of daily living, in maintaining social functioning, and in maintaining

concentration, persistence, or pace. He found that Plaintiff would experience one or two episodes of decompensation, each of an extended duration. (Id. at 431-44).

Plaintiff was examined on January 19, 2008, by Dr. Christopher Foti, a consultative examiner, at the request of the Agency. (Id. at 456-61). On examination, Plaintiff was in no acute distress and was alert and oriented times three. No muscle asymmetry, atrophy, involuntary movements, structural deformity, effusion, periarticular swelling, crythema, heat, swelling, or tenderness were noted. Plaintiff's gait was normal, and she was able to rise from a sitting position without assistance, stand on tiptoes, and heel/toe walk. Dr. Foti's report reflects that Plaintiff had mild difficulty bending and squatting due to back pain. Plaintiff's grip was 5/5 bilaterally with fine motor movements, dexterity, and grip. He noted that Plaintiff's active range of motion with lumbar flexion was mildly diminished. Dr. Foti diagnosed Plaintiff with low back pain s/p surgery, hypothyroidism, hypertension, and sleep disorder. He opined that Plaintiff should be able to sit, walk, and/or stand for a full workday, lift/carry objects less than 20 pounds, hold a conversation, respond appropriately to questions, and carry out and remember instructions. (Id. at 457-9). He also remarked that Plaintiff did not appear depressed or anxious.

Shortly after Dr. Foti's examination and report, Agency medical consultant Jane Menard completed a physical RFC assessment dated February 7, 2008. She noted that Plaintiff has S/P L spine fusion at L5-S1, degenerative disc disease of the cervical spine, and osteoarthritis. She opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push and/or pull for an unlimited amount of time. She also opined that Plaintiff could never climb ladders/ropes/scaffolds, and that she could occasionally climb ramps/stairs, kneel, crouch, and crawl and could frequently balance. She further opined that Plaintiff should avoid concentrated exposure to extreme cold, wetness, humidity, vibrations, and hazards, and that Plaintiff had no manipulative, visual, or communicative limitations. (Id. at 462-9).

### 1.   Whether the ALJ properly evaluated the medical opinions contained in the record?

In her brief, Plaintiff asserts that the ALJ erred in relying on the opinions of one-time consulting physician Dr. Foti rather than the opinion of Dr. Mitchell, who is both a pain specialist and Plaintiff's treating pain management physician. Plaintiff avers that Dr. Mitchell's records are consistent with the records of Dr. Rollins, her prior pain management physician,

as well as the clinical and diagnostic evidence, and that the ALJ failed to provide good cause for discounting the opinion of Dr. Mitchell, her treating physician. Plaintiff contends that the ALJ further erred by rejecting the opinions of her treating psychiatrist, Dr. Concepcion, in favor of one-time examining psychologist Dr. Cerwonka.

The Commissioner argues that the ALJ had good cause for discounting Dr. Mitchell's opinions because they were inconsistent with the record evidence and his own treatment notes. The Commissioner further contends that the ALJ had good cause for discounting Dr. Concepcion's opinions and reasonably determined that Dr. Concepcion's opinions were incongruent with his statement that Plaintiff could perform low stress work.

Case law provides that "[t]he ALJ must generally give the opinion of a treating physician 'substantial or considerable weight' absent a showing of good cause not to do so." Newton v. Astrue, 297 Fed. Appx. 880, 883 (11th Cir. 2008). See also Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) (a treating physician's opinion must be given substantial weight unless good cause is shown to the contrary). The Eleventh Circuit has concluded "good cause" exists when a treating physician's opinion is not bolstered by the evidence, is contrary to the evidence, or when the treating physician's opinion is inconsistent with his or her own medical records. Phillips v.

Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Generally, an ALJ commits reversible error where he fails to articulate the reason for giving less weight to the opinion of a treating physician. MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2007)(per curiam)(the ALJ must accord substantial or considerable weight to opinion of treating physician unless "good cause" is shown to the contrary).

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. See Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984). Of course, it is the ALJ's duty, as finder of fact, to choose between conflicting evidence, and he may reject the opinion of any physician when the evidence supports a finding to the contrary. Ellison v. Barnhart, 355 F.3d 1272, 1275-76 (11th Cir. 2003) (per curiam), citing Oldham v. Schweiker, 660 F.2d

1078, 1084 (5th Cir. 1981) (holding that "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion") (citation omitted); Kennedy v. Astrue, 2010 U.S. Dist. LEXIS 39492, *22-23 (S.D. Ala. Apr. 21, 2010) ("[I]t is the ALJ's duty, as finder of fact, to choose between conflicting evidence[,] and he may reject the opinion of any physician when the evidence supports a finding to the contrary."). Based upon a careful review of the record, the undersigned finds that the ALJ offered good cause for rejecting the opinions of Drs. Mitchell and Concepcion.

In discussing the opinions of Plaintiff's treating psychiatrist and pain management specialist, the ALJ stated, as follows:

> I reject the assessments of Dr. Mitchell and Dr. Concepcion as they are apparently based on subjective complaints and are inconsistent with the actual treatment notes and other evidence. Dr. Foti concluded that, the claimant could sit, walk and/or stand for a full workday, lift and carry objects less than 20 pounds, and remember and carry out instructions (Exhibit 14F). Dr. Cerwonka said the claimant, with her mental impairment, could understand, retain and follow instructions, sustain enough concentration and attention to perform both simple and more complex tasks, and she would have no problems relating to others one on one. He saw no psychiatric, cognitive, or behavioral reason that she could not perform regular full-time work (Exhibit 10F). I give more weight to the opinions given by Dr. Foti and Dr. Cerwonka, as they are

> consistent with the objective findings and
> results.

(Tr. at 3) (emphasis in original).

In reaching this determination, the ALJ clearly considered all of the evidence of record, including the treatment notes of both Dr. Mitchell and Dr. Concepcion. The ALJ discussed the treatment notes of these doctors and the other medical evidence of record and concluded that their assessments were not consistent with their treatment notes or the other evidence of record. As noted supra, following Plaintiff's anterior fusion surgery in 2003, Dr. Gower noted that she was doing well from a back standpoint, but expressed concern regarding her dependence on narcotic pain medication. (Id. at 217) A CT scan of Plaintiff's lumbar spine nearly three years later, in October 2006, showed that Plaintiff's joints and body fusion were properly fused and there was no indication of adjacent segment disease. (Id. at 197-98) While Dr. Gower suggested that Plaintiff's neck pain was likely related to some spondylosis on the neck and her arm pain was likely related to carpal tunnel syndrome, no surgery was recommended. He instead opined that Plaintiff was a good candidate for further conservative measures. (Id.)

Plaintiff was indeed treated by two pain specialists, first Dr. Rollins and then, Dr. Mitchell. Dr. Rollins' treatment notes

reflect that on physical exam, Plaintiff had decreased range of motion in her neck and back, her muscles strength in her lower and upper extremities was generally 5/5, her gait and station was normal, and she had negative straight leg results.  In 2006, Dr. Rollins concluded, based on his "objective findings," that Plaintiff is not disabled.  (Id. at 242-3).

While Dr. Mitchell, concluded, in April 2008, that Plaintiff could occasionally lift or carry up to five pounds, and that Plaintiff is not able to stand, walk or sit more than one hour in an 8 hour work day, his treatment notes reflect his examination results and course of treatment for Plaintiff were similar to those of Dr. Rollins. (Id. at 385-7) Dr. Mitchell noted upon examination that Plaintiff has decreased motion in neck and back, trigger points in low back and neck, normal gait and negative leg raising. (Id.)

Upon his consultative examination of Plaintiff, Dr. Foti also found that her range of motion with lumbar flexion was mildly diminished, that she could heel and toe walk, that her gait was normal, that she was able to rise from a sitting position without assistance, and that she is able to sit, walk, and stand for a full workday, and can carry/lift objects less than twenty pounds.  (Id. at 456-61). In addition, Plaintiff has reported that she is able to take care of her personal needs, care for her dog, cook, perform light housekeeping, shop, and

drive. (Id. at 37-57)   In the face of this record evidence, the ALJ, who is responsible for resolving conflicts in the evidence, rejected the extreme physical restrictions offered by Dr. Mitchell.   The undersigned finds that in light of the objective medical evidence, the treatment notes of Dr. Gower, Dr. Rollins and Dr. Foti, and other evidence of record, the ALJ had good cause for rejecting the extreme restrictions contained in Dr. Mitchell's assessment.

The ALJ also had good cause for rejecting the "marked" limitations of Dr. Concepcion, one of Plaintiff's treating psychiatrists.   As noted supra, the treatment notes reflect that Plaintiff has a history of treatment for depression and related symptoms.   Following reports of severe depression, anxiety and suicidal ideas in June of 2005, Plaintiff was admitted by Dr. Hutto, for treatment at Ridgeview. (Id. at 317-320) While Plaintiff's GAF was "25" upon admission, her condition improved, and Dr. Hutto released her to return to work in August 2005. (Id. at 320; 330). Plaintiff was recommended for partial hospitalization in 2007 after she reported struggling with depression and daily thoughts of death.   While her GAF was "35" upon admission, her condition "moderately improved" and her GAF was "50" at the time of her discharge. (Id. at 341-343; 351-2).

Plaintiff was seen by Dr. Concepcion twice in 2008. Her GAF was "40," her mood was depressed, her concentration and

attention were impaired and she had "flight of ideas," but her judgment and memory were intact.   Plaintiff was provided medication and did not see Dr. Concepcion until over a year later, in 2009.   (Id. at 371-1, 145-9; 481-7; 515 – 29).   At that time, Dr. Concepcion opined that she is " markedly limited" in a number of areas, including the ability to remember locations and work-like procedures, understand and remember detailed instructions, maintain attention and concentration for extended periods, and in her ability to maintained regular and punctual attendance.   (Id. at 515-23). Dr. Concepcion listed Plaintiff's GAF score at "35," and opined that Plaintiff is capable of low stress work.

The   ALJ,   in   rejecting   Dr.   Concepcion's   "markedly limitations" correctly found that they were not consistent with Dr. Concepcion's opinion that Plaintiff is capable of low stress work.   Further, while Dr. Concepcion listed Plaintiff's GAF score as "35," the record reflects that Plaintiff was able to live alone, take care of her personal needs, shop, do light house keeping, take care of her financial affairs, drive herself to appointments, regularly talk to family and friends on the telephone, and use her computer.   This evidence, along with evidence   of   Plaintiff's   limited   treatment,   is   additional evidence supportive of the ALJ's decision.   In addition, Plaintiff underwent a consultative examination by Dr. Cerwonka,

and during the exam, she exhibited good memory, recall and concentration, and she was able to understand and follow instructions. Dr. Cerwonka, like Dr. Hutto, opined that Plaintiff is capable of performing full-time work.  In the face of this substantial evidence, the undersigned finds that the ALJ proferred good cause for rejecting the extreme limitations offered by Dr. Concepcion.  See Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) (good cause exists when the treating physician's opinion was not bolstered by record evidence and was inconsistent with the doctor's own records).

### 2.  Whether the ALJ complied with SSR 96-7p when evaluating Plaintiff's credibility and her subjective complaints of pain?

Plaintiff also argues that the ALJ erred in failing to credit her testimony regarding pain, medication side effects, and work history. The Commissioner contends that the ALJ thoroughly discussed Plaintiff's complaints of pain before concluding that they were not supported by the evidence of record, and he set forth multiple reasons which support his finding that Plaintiff's subjective complaints were not fully credible.

Credibility determinations are within the province of the ALJ.  Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005). However, where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate "explicit and

adequate reasons" for doing so, or the record must be obvious as to the creditability finding. Jones v. Dep't of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "'the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding.'" Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995), quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See, e.g., Hale v. Bowman, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

The ALJ must consider all of a claimant's statements about her symptoms, including pain[9], and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. Relying on the treatment records and objective evidence, the ALJ in this case

---

[9] Pain is a non-exertional impairment. Foote, 67 F.3d at 1559.

concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, however, Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with Plaintiff's RFC. (Tr. at 28). Specifically, the ALJ found that Plaintiff's reported side effects seemed extreme in nature and that she continued to take those medications without adjustment. (Id. at 29). The record indicates that Plaintiff was prescribed Provigil, and she testified that it all but eliminated her side effects.

Additionally, the ALJ explained that Plaintiff's allegations of pain seemed disproportionate to the objective medical findings. Indeed, repeat scans of her cervical and lumbar have showed no malalignment of the spine and Dr. Gower, who performed her surgery in 2003, opined that she was a candidate for continued conservative treatment. Further, Plaintiff's reported daily activities are not consistent with her alleged level of pain. After a careful review of the record, the undersigned finds that the ALJ's credibility finding is supported by substantial evidence and concludes that the ALJ's reasons for discrediting Plaintiff's testimony were clearly articulated in the decision. As noted above, this court may not decide the facts anew, reweigh the evidence, or substitute its

judgment but must accept the factual findings of the Commissioner where they are supported by substantial evidence and based upon the proper legal standards. Bridges v. Bowen, 815 F.2d 622 (11th Cir. 1987); see also Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1985).

### 3. Whether the ALJ erred by presenting an incomplete hypothetical to the VE?

Plaintiff argues that the hypothetical relied upon by the ALJ did not include limitations from Dr. Mitchell and Dr. Concepcion, who opined that Plaintiff would be absent more than three times per month and that she would have marked physical and mental limitations. The Commissioner counters that having reasonably rejected the opinions expressed by Drs. Mitchell and Concepcion in their assessments, the ALJ did not err when he did not accept the VE's testimony relating to those opinions.

The record reflects that the ALJ presented four hypotheticals to the VE. In the first hypothetical, the ALJ asked the VE to assume an individual of similar age, education and prior work history as Plaintiff, and to assume that the individual could lift 20 pounds occasionally and ten pounds frequently, could sit, stand, or walk six hours out of an eight hour work day but only one hour continuously, and would be unable to perform any complex work. The VE testified that such an individual could not return to her past relevant work, but

could perform other jobs such as gate guard or file clerk. (Id. at 59).

In the second hypothetical, the ALJ included the same limitations, except that the person could only lift up to ten pounds occasionally and five pounds frequently, could stand and walk for two hours in an eight hour workday but not more than one hour continuously, could sit for six hours but not for more than one hour continuously, and would be unable to do perform complex work.  In response, the VE testified that such a person could perform the positions of check cashier and sorter. (Id. at 59-60).  Additionally, the VE noted that the jobs of sorter and check cashier would allow for someone to stand at their option and stretch if necessary. (Id. at 60).

In the third and fourth hypotheticals, the ALJ included the same limitations, and added the restriction that the person would have physical and mental problems, including pain, such that they would unpredictably miss three or four days of work a month or that the person would miss five or six days of work a month due to stress.  In response to these hypotheticals, the VE testified that there would be no jobs that such a person could perform on a sustained basis. (Id. at 60-1)

Once a plaintiff proves that he cannot return to his past relevant work, the burden shifts to the Commissioner to show that the claimant can perform other jobs that are significant in

number in the national economy, considering age, education, and work experience.  Gibson v. Heckler, 762 F. 2d 1516, 1518-19 (llth Cir. 1985).  The burden is on the ALJ to provide evidence about the existence of other work in the national economy that a claimant can perform. Reeves v. Heckler, 734 F.2d 519, 525 (llth Cir. 1984).  The ALJ can satisfy this burden and provide this evidence through a VE's testimony. Phillips v. Barnhart, 357 F.3d 1232, 1240 (llth Cir. 2004).   In order for the VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.  Phillips, 357 F.3d at 1240 n.7.  Further, the ALJ must articulate specific jobs that exist in the national economy that a claimant can perform. Allen v. Sullivan, 880 F. 2d 1200, 1202 (llth Cir. 1989).

In this case, the record reflects that the VE testified, in response to the third and fourth hypotheticals, that there were no jobs that Plaintiff could perform; however, this hypothetical was based on the extreme limitations found in Dr. Mitchell and Dr. Concepcion's opinions.  As noted supra, the ALJ properly rejected those opinions because they were inconsistent with the objective medical evidence and the other evidence of record, supported mostly by Plaintiff's subjective statements, and were inconsistent with the doctors' own treatment notes.  Having properly rejected those opinions, the ALJ did not err when he

did not include the restrictions imposed by either Dr. Mitchell or Dr. Concepcion in Plaintiff's RFC and when he rejected that portion of the VE's testimony based on those restrictions. See Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1161 (11th Cir. 2004)(an ALJ need not include findings in the hypothetical to the VE that have been properly discounted or rejected as unsupported by the evidence).

**V.    Conclusion**

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits and supplemental security income, be **AFFIRMED**.

**DONE** this **15th** day of **August, 2012.**


_____/s/ SONJA F. BIVINS__ ____
**UNITED STATES MAGISTRATE JUDGE**